

AO 91 (Rev. 11/11) Criminal Complaint

FILED
6/26/2020
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Kalia Coleman, (312) 353-3540
AUSA Katie Durick, (312) 886-7641

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

v.

KENDRICK PEPPER, and
LAMONT HAGGARD

CASE NUMBER:  20 CR 327

**UNDER SEAL**

Honorable Maria Valdez
United States Magistrate Judge

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From on or about April 21, 2020, to, on or about June 22, 2020, in the Northern District of Illinois, Eastern Division, the defendants violated:

*Code Section*

Title 21, United States Code, Sections 841(a)(1) and 846

*Offense Description*

From on or about April 21, 2020 to on or about June 22, 2020, in the Northern District of Illinois, Eastern Division, the defendants did conspire with each other and with others to knowingly and intentionally possess with intent to distribute and to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, and a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

This criminal complaint is based upon these facts:

   X    Continued on the attached sheet.

ARTYOM POSTUPAKA
Special     Agent,     Drug     Enforcement
Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Sworn to before me and signed in my presence.

Date: June 26, 2020

*Judge's signature*

City and state: Chicago, Illinois

MARIA VALDEZ, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ss

## AFFIDAVIT

I, ARTYOM POSTUPAKA, being duly sworn, state as follows:

## INTRODUCTION

1.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed since September of 2018. From September of 2012 to September of 2018, I was employed as a Police Officer with the Village of Lisle Police Department. I was assigned as a Task Force Officer to the DEA from July of 2014 to August of 2018.

2.     I am currently assigned to DEA Chicago High Intensity Drug Trafficking Agency Group 43 located in Chicago, Illinois. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the federal controlled substance laws, including, but not limited to, Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, witnesses, and others who have knowledge of the distribution, transportation, storage, and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations, and methods used by drug dealers to conceal and

launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     This affidavit is submitted in support of a criminal complaint alleging that KENDRICK PEPPER ("PEPPER") and LAMONT HAGGARD ("HAGGARD"), have violated Title 21, United States Code, Sections 841(a)(1) and 846. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging PEPPER and HAGGARD with conspiring to distribute fentanyl mixed with heroin, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the complaint.

5.     The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other law enforcement officers, including oral and written reports that I have received from other law enforcement officers; (c) telephone records, including subscriber information, toll records, pen registers, and trap and trace information, phone location monitoring, and intercepted communications; (d) information obtained from consensually-recorded conversations between HAGGARD and undercover officers and in-person meetings; (e) information obtained from intercepted communications over PEPPER's mobile phone; (f) the results of physical surveillance conducted by other law enforcement officers; (g) information provided by confidential sources working for the DEA or other law enforcement agencies; (h) information obtained

2

from driver's license and automobile registration records; (i) information from public records and law enforcement databases; (j) my training and experience and the training; and (k) experience of other law enforcement officers involved in this investigation.

## I.   OVERVIEW OF THE INVESTIGATION

6.     Based on information from confidential sources, consensually recorded calls, intercepted phone conversations, physical and video surveillance, controlled purchases and narcotics seizures, I believe that PEPPER has engaged in the illegal trafficking of heroin on the west side of Chicago. Law enforcement's investigation of PEPPER has revealed that PEPPER distributes large quantities of heroin and crack cocaine to individuals, including LAMONT HAGGARD who distribute the narcotics at PEPPER's direction. As discussed in detail below, PEPPER generally supplies the narcotics to HAGGARD and others from the PEPPER's Apartment Building.[1] HAGGARD, in turn, has sold narcotics to an undercover officer on multiple occasions. Specifically, as outlined below, HAGGARD has sold the following narcotics, supplied by PEPPER, to officers acting in an undercover capacity: (1) on or about April 21, 2020, approximately 5.836 grams (net weight) of heroin laced with fentanyl; (2) on or

---

[1] Law enforcement believes that PEPPER resides in an apartment located at 224-2 S. Campbell Avenue in Chicago (PEPPER's Residence), because as further discussed below, between April and June 2020 and on a near-daily basis, PEPPER and Individual TS have been observed via surveillance footage entering and exiting PEPPER's Residence through a door marker "224-2." Throughout this Affidavit, the entire apartment building structure is referred to as PEPPER's Apartment Building. As discussed below, PEPPER and HAGGARD were observed at PEPPER's Apartment Building on numerous occasions at times close to requests from HAGGARD for resupply of narcotics from PEPPER.

about April 23, 2020, approximately 11.619 grams (net weight) of heroin laced with fentanyl; (3) on or about April 29, 2020, approximately 36.6 grams (gross weight) suspect heroin laced with fentanyl; and (4) on or about May 8, 2020, approximately 17.2 grams (gross weight) suspect heroin laced with fentanyl.

## II.  FACTS SUPPORTING PROBABLE CAUSE

### A.  *April 21, 2020: HAGGARD obtained fentanyl-laced heroin from PEPPER and provided 5.836 grams of it to UC-2.*

7.     On April 21, 2020, at approximately 12:04 p.m., HAGGARD, who was using a telephone number ending in -5964 ("HAGGARD's Phone"), placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 607).[2] During this

---

[2] This Affidavit references phone calls intercepted pursuant to an order entered by Chief Judge Rebecca R. Pallmeyer on April 17, 2020. That order authorized, among other things, interception of phone calls over the phone assigned number (312) XXX-6507 ("Target Phone 3").

Law enforcement identified PEPPER as the user of Target Phone 3 based on the following: (1) According to a review of recorded jail calls, on or about January 19, 2020, Target Phone 3 placed a call to an incarcerated inmate in Kankakee County jail. Law enforcement officers who have previously participated in a face-to-face interview of PEPPER, on or about September 14, 2018, and have listened to his voice on various social media videos, identified the voice captured on the jail call as PEPPER's; (2) In a law enforcement interview in September 2018, Individual TS identified herself as PEPPER's girlfriend. Individual TS's name is listed as the subscriber for Target Phone 3 and; (3) during the course of the investigation, law enforcement has intercepted telephone calls over Target Phone 3 where the user of Target Phone 3 agreed to meet with individuals and then law enforcement officers surveilled PEPPER meeting with individuals at the same time/location as discussed over Target Phone 3.

Law enforcement identified HAGGARD as the user of HAGGARD's Phone based, in part, on the following: Agents while monitoring Target Phone 3 learned that PEPPER referred to the user of HAGGARD's Phone as "Lamont." Furthermore, during deals with undercover officers, HAGGARD provided the number for HAGGARD's Phone as his phone number. Lastly, undercover officers completed a voice comparison from recordings of undercover deals with HAGGARD and recordings of the user of HAGGARD's Phone and identified the user of HAGGARD's Phone to be LAMONT HAGGARD.

call, HAGGARD asked, "You for soft [Do you have heroin/fentanyl]?" PEPPER replied, "Yeah." HAGGARD stated, "Here I come."

8.     At approximately 12:30 p.m. an undercover officer ("UC-2") arrived in the area of Sacramento Boulevard and Adams Street in Chicago. Surveillance observed  HAGGARD, along with an unknown woman, pull onto Sacramento Boulevard in a green 2003 Ford Explorer, bearing Illinois license plate number BQ69183 ("PEPPER's Vehicle"). HAGGARD parked PEPPER's Vehicle on Sacramento Boulevard, facing south. HAGGARD exited PEPPER's Vehicle and began walking east on Adams Street. Surveillance agents advised UC-2 of HAGGARD's location.

9.     At approximately 12:30 p.m., UC-2, who was equipped with an audio/video recording device, approached HAGGARD on foot. Based on my review of the recording, UC-2 approached HAGGARD and asked, "You got yellow bags [of heroin] on you bro?" HAGGARD replied, "Man this is what we moved everything over here man. We had to switch the bag color, the fucking police man." UC-2 replied, "Hey, hook me up man." HAGGARD asked, "What you want [what/how much narcotics do you want]?" UC-2 asked, "What can you do for $100 man? Can you hook

---

Summaries are provided herein based on drafts and not final transcripts and contain my interpretation of words and phrases used in the recorded communications. Unless otherwise noted, the quoted conversations in this affidavit are only portions, not full transcriptions, of the recorded conversations that occurred. At various points in the Affidavit, I have included in brackets my interpretation of words and phrases used in the recorded conversations. I base my interpretations on information received from cooperating sources, the content and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

me up?" HAGGARD replied, "Come in the gate man. I don't know, I already owing some money right now." UC-2 observed HAGGARD walk into a residence on the 2900 block of West Adams and exit a short time later.

10.    According to UC-2 and audio/video captured from UC-2's recording device, at approximately 12:33 p.m., UC-2 and HAGGARD walked towards PEPPER's Vehicle. UC-2 entered the front passenger's seat of PEPPER's Vehicle, while HAGGARD entered the driver's seat. While inside the vehicle, HAGGARD stated, "They [customers] eat this shit [narcotics] up man. We just started this shit over here and they buy the fuck out this shit [narcotics]." UC-2 then handed $100 to HAGGARD. In exchange, HAGGARD counted aloud ten small clear Ziploc-style baggies, with a blue star logo, containing a white powdery substance and handed the baggies to UC-2. UC-2 asked HAGGARD for his phone number. HAGGARD wrote on a scrap of paper the telephone number for HAGGARD's Phone and passed it to UC-2. HAGGARD told UC-2, "I'm 24 hours, too. That's my name, Lamont." UC-2 exited PEPPER's Vehicle and departed the area.

11.    Law enforcement submitted the substance that HAGGARD distributed to UC-2 to a DEA Laboratory, which found that the substance consisted of 5.836 grams of heroin mixed with fentanyl.

12.    Following HAGGARD's distribution to UC-2, HAGGARD contacted PEPPER to request a resupply of narcotics. Specifically, at approximately 12:40 p.m., PEPPER, on Target Phone 3 (Target Phone 3, Session 615) received a call from an unidentified female. During this call, the female appeared to pass the phone to

HAGGARD and HAGGARD stated, "Hey, baby boy." PEPPER replied, "Yeah." HAGGARD replied, "I'm finna pull back there [PEPPER's Apartment Building] for another soft [heroin] right quick." PEPPER replied, "A'ight." At approximately 12:42 p.m., law enforcement officers observed HAGGARD depart the location where HAGGARD had met with UC-2 while in PEPPER's Vehicle. Officers observed PEPPER's Vehicle travel to the rear of the Apartment Building where PEPPER'S Residence[3] is located.

### B. April 23, 2020: HAGGARD obtained fentanyl-laced heroin from PEPPER and provided 11.619 grams of it to UC-2.

13. On April 23, 2020, UC-2 placed a consensually recorded call to HAGGARD, who was using HAGGARD's Phone.[4] During the call, UC-2 asked, "You gonna hook me up this time? I'm gonna bring 200." HAGGARD replied, "I'mma try to do what I can do man." HAGGARD continued, "You know I could do that shit when I was with the yellow [a different spot for selling narcotics], they just opened this motherfucker, man. Come over, I'mma see if I can get the shit tho." HAGGARD explained, "You come over here, I got a jab [10 baggies of heroin] for you and then goddamit I can put the bike in the back and we can go down and I can persuade dude to give you one." HAGGARD and UC-2 agreed to meet in the area of Sacramento Boulevard and Adams Street.

---

[3] See Footnote 1.

[4] The time of this call was not recorded.

14.     At approximately 9:58 a.m., surveillance observed PEPPER's Vehicle pull over near UC-2 on W. Adams Street. UC-2 was riding a bicycle. UC-2 walked over to PEPPER's Vehicle and HAGGARD exited the vehicle. HAGGARD walked to the rear of PEPPER's Vehicle and opened the back trunk. UC-2 placed his/her bicycle into the back of the vehicle. HAGGARD returned to the driver's side of the vehicle and UC-2 got into the front passenger seat of the vehicle.

15.     Based on the statements of UC-2, as well as a review of UC-2's audio/video recording device, while in the vehicle, UC-2 stated, "Let me get 20 [baggies of heroin/fentanyl] man." HAGGARD held an unknown number of small Ziploc-style baggies containing a white powdery substance, counted out fourteen baggies, and handed them to UC-2. HAGGARD stated, "That's fourteen. We're finna go grab the others, that's why I said put your bike in the back." UC-2 then passed $140 to HAGGARD. HAGGARD told UC-2 that he needed to pick up the remaining six bags and said, "I'll call him right now." HAGGARD further stated, "When they [HAGGARD's supplier, PEPPER] open they give me fucking a pack [a jab, 10 to 14 baggies of heroin/fentanyl] at a time so." UC-2 inquired about why HAGGARD was able to sell UC-2 a larger quantity of narcotics in the past. HAGGARD explained, "That bitch [drug market] was banging tho', we just opened up." HAGGARD asked, "Did you like the shit the other day [referring to the heroin/fentanyl HAGGARD sold to UC-2 on April 21, 2020]?" UC-2 replied, "Yeah, I do." HAGGARD replied, "It [heroin/fentanyl] has these motherfuckers sucking his own dick [the strength of the narcotics is good]."

16. At approximately 10:01 a.m., HAGGARD, along with UC-2 and an unknown male, departed the area in PEPPER's Vehicle, and surveillance was maintained.

17. At the same time, HAGGARD, using HAGGARD's Phone, placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 878). HAGGARD stated, "I need some more soft [heroin/fentanyl]." PEPPER replied, "A'ight." HAGGARD replied, "Yeah, I'm coming right now."

18. At approximately 10:06 a.m., surveillance observed PEPPER's Vehicle drive down the 200 block of S. Maplewood Avenue, conduct a U-turn and park the vehicle. HAGGARD exited PEPPER's Vehicle.

19. At approximately 10:07 a.m., HAGGARD, using HAGGARD's Phone, called PEPPER, on Target Phone 3 (Target Phone 3, Session 880). HAGGARD said, "Yeah, I'm back here." PEPPER responded, "Alright." At approximately 10:08 a.m., surveillance observed HAGGARD exit PEPPER's Vehicle and enter the rear, fenced area of PEPPER's Apartment Building.

20. At approximately 10:14 a.m., surveillance observed HAGGARD exit the rear fenced area and walk towards PEPPER's Vehicle. HAGGARD entered the front driver's side of the vehicle. At this time, UC-2 observed HAGGARD holding an unknown number of small Ziploc-style baggies, each containing a white powdery substance. According to UC-2, HAGGARD then counted aloud six clear Ziploc-style baggies, with blue stars, and handed them to UC-2. UC-2 then passed HAGGARD

$60.

21. At approximately 10:17 a.m., surveillance observed UC-2 and HAGGARD exit PEPPER's Vehicle to remove the UC-2's bike from the back. UC-2 then left the area.

22. Law enforcement submitted the substance that HAGGARD distributed to UC-2 to a DEA Laboratory, which found that the substance consisted of 11.619 grams of heroin mixed with fentanyl.

### C. April 29, 2020: HAGGARD obtained suspect fentanyl-laced heroin from PEPPER and Individual TS and provided 36.6 grams (gross weight) of it to UC-2 and UC-3.

23. On or about April 29, 2020, at approximately 8:44 a.m., UC-2 placed a consensually recorded call to HAGGARD, who was using HAGGARD's Phone. During the call, UC-2 asked, "Can you get me that twenty bags [of heroin] again, bro?" HAGGARD replied, "He [HAGGARD's supplier, PEPPER] don't do it like that. He don't let me ride around with a lot of shit [narcotics] like that. The shit's [narcotics] in the hallway, all I do is go get it." UC-2 and HAGGARD agreed to meet at Western Ave and Lake St. to complete the narcotics transaction.

24. At approximately 9:15 a.m., UC-2 arrived at Western Avenue and Lake Street.

25. At approximately 9:21 a.m., surveillance observed HAGGARD arrive, driving PEPPER's Vehicle. At this time, UC-2 approached the vehicle, placed his bike in the rear of the vehicle and entered the passenger side. HAGGARD then drove away.

26. At approximately 9:23 a.m., HAGGARD, using HAGGARD's Phone, placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 2008). During this call, HAGGARD stated, "You still not home yet?" PEPPER replied, "Yeah, I'm here." HAGGARD replied, "I need to come grab soft [heroin]." PEPPER replied, "Alright, come on."

27. Based on information from UC-2, as well as UC-2's audio/video recording device, moments after placing the call to PEPPER, HAGGARD told UC-2, "This little dude right here [PEPPER], man, I don't fuck with nobody else but him, man. Like if I ain't got no money let's say we ain't got no work [narcotics], he'll give me money every day until we get re-up. He gave me his truck [PEPPER's Vehicle], he said, 'Man, as long as you working, take the truck, keep it stay out, you ain't gotta get wet.'" HAGGARD continued, "Yeah I like fucking with this cat. And he keep the dope [narcotics] right." HAGGARD further explained that people call him on his phone for narcotics and that he then drives up and delivers to them. HAGGARD related in reference to PEPPER, "The other night he [PEPPER] got a phone, that people [unintelligible], he [PEPPER] got one phone that people buy cocaine off of. I sit on the block and he [PEPPER] call and say man go over here." HAGGARD also stated, "This motherfucker is just getting off the ground, so when we was doing the yellow [a previous distribution chain of heroin] it's not there yet, it's almost. Yeah but see this is totally different dope [narcotics] than the yellow, man. That yellow shit had me blowing all types of bullshit out my nose."

11

28. At approximately 9:25 a.m., surveillance observed HAGGARD and UC-2, in PEPPER's Vehicle, arrive in the rear alley behind PEPPER's Apartment Building. Once parked, UC-2 observed HAGGARD reach into his jacket pocket and remove an unknown number of small Ziploc-style baggies with blue stars and containing a white powdery substance. HAGGARD then counted aloud ten baggies and handed them to the UC-2. In exchange for the ten baggies, UC-2 gave HAGGARD $100. HAGGARD stated, "I'mma get this shit and come right out, right in the fucking hallway. Let me call him and tell him to come on downstairs."

29. At approximately 9:27 a.m., HAGGARD, using HAGGARD's Phone, placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 2010). HAGGARD said, "Yeah, I'm out here." PEPPER replied, "Alright." After the call ended, UC-2 observed HAGGARD exit PEPPER's Vehicle and enter the rear, fenced area of PEPPER's Apartment Building.

30. A short time later, UC-2 observed HAGGARD walking back to PEPPER's Vehicle holding Ziploc-style baggies in his hand. Based on information from UC-2 and my review of UC-2's audio/video recording device, HAGGARD got into PEPPER's Vehicle and counted aloud another ten Ziploc-style baggies, with blue stars, containing a white powdery substance and gave them to UC-2. In exchange, UC-2 gave HAGGARD another $100.

31. At approximately 9:35 a.m., surveillance observed HAGGARD and UC-2 arrive back in the area of Western Avenue and Lake Street. At this time, UC-2 exited PEPPER's Vehicle, retrieved his/her bike from the vehicle, and left the area.

32.    At approximately 10:22 a.m., (Target Phone 3, Session 2014), HAGGARD, using HAGGARD's Phone, had a conversation with PEPPER, who was using Target Phone 3. HAGGARD stated, "You got any hard [crack cocaine]?" PEPPER replied, "Yeah." HAGGARD replied, "Here I come." PEPPER replied, "Okay."

33.    At approximately 10:23 a.m., (Target Phone 3, Session 2015), PEPPER, using Target Phone 3, had a conversation with Individual TS, who was using a telephone number ending in 1755 ("Individual TS's Phone").[5] PEPPER stated, "Hey, uh, I need one favor. I know you don't wanna do it." Individual TS replied, "You always need a damn favor. What do you want?" PEPPER stated, "I just left though, I just left. LAMONT [HAGGARD] is gonna come back for uh…. Look in my bag, one of them blue things [crack cocaine]. They, everything in there, blue. The hard stuff [crack cocaine]." Individual TS replied, "Your ass always just leaving when they coming." Later in the conversation, Individual TS stated, "What am I giving him? [HAGGARD]" PEPPER replied, "Just one [quantity of narcotics]." Individual TS stated, "Which one Kendrick? There's soft [heroin] and hard [crack cocaine] here." PEPPER replied, "The hard [crack cocaine], the hard [crack cocaine], it's all blue. That's what I said a hard [crack cocaine]." Individual TS stated, "Alright."

---

[5] Law enforcement identified the user of Individual TS's Phone as Individual TS because the phone is registered to Individual TS and, in addition, law enforcement identified Individual TS as meeting with HAGGARD based on a comparison to a driver's license picture of Individual TS.

34.     At approximately 10:27 a.m., (Target Phone 3, Session 2016), PEPPER, using Target Phone 3, had a conversation with HAGGARD, who was using HAGGARD's Phone. HAGGARD stated, "Yeah, touchdown [HAGGARD stated he's at PEPPER's Residence]." PEPPER replied, "Hello... alright." HAGGARD stated, "Yeah, saying touchdown, Yup."

35.     At approximately 10:28 a.m., (Target Phone 3, Session 2018), PEPPER, using Target Phone 3, had a conversation with Individual TS, who was using Individual TS's Phone. Individual TS stated, "Hello." PEPPER replied, "He [HAGGARD's] back there." PEPPER replied, "Alright." Individual TS stated, "He [HAGGARD] gonna give you some money too." Individual TS stated, "Alright."

36.     At approximately 11:22 a.m., (Target Phone 3, Session 2035), PEPPER, using Target Phone 3, had a conversation with HAGGARD, who was using HAGGARD's Phone. During this call, PEPPER asked, "You had called me?" HAGGARD replied, "Oh, yeah, yeah, no, I had told you what [narcotics] I needed. I went and got it already." PEPPER replied, "You had got... alright." HAGGARD replied, "Huh?" PEPPER replied, "You had gave her [Individual TS] the money and stuff?" HAGGARD replied, "Yeah, yeah, I gave it to her."

37.     Later that day, at approximately 2:27 p.m., UC-2 placed a consensually recorded call to HAGGARD and related, "Hey man uh I passed off your number, alright. These two white girls [UC-3 and UC-4]."

38.     At approximately 2:44 p.m., UC-3 placed a consensually recorded call to HAGGARD, at HAGGARD's Phone. During the call, UC-3 stated, "[UC-2] gave me

14

your number." HAGGARD replied, "Yeah, yeah." UC-3 continued, "Do you think me and one of my girls can come and get some [narcotics] from you?" HAGGARD and UC-3 decided to meet at a Walgreens store on W. Madison Street in Chicago to complete the narcotics transaction. Later during the call, UC-3 asked, "How much are you gonna have do you have enough to give us like 2 jabs [of heroin] or $200 worth?"

39.     At approximately 2:47 p.m., UC-3 placed another consensually recorded call to HAGGARD, on HAGGARD's phone. HAGGARD related, "I can get you what you want."

40.     At approximately 2:54 p.m., HAGGARD, using HAGGARD's Phone, had a conversation with PEPPER on Target Phone 3 (Target Phone 3, Session 2117). During this call, HAGGARD stated, "[Unintelligible] and on that other thing, [unintelligible] some hard [crack cocaine], [unintelligible] come and get some hard so let's [unintelligible]." PEPPER replied, "Okay."

41.     At approximately 3:12 p.m., UC-3 and UC-4 arrived at the Walgreen's and parked in the lot.

42.     At approximately 3:14 p.m., UC-3 placed a consensually recorded call to HAGGARD, on HAGGARD's Phone, and informed HAGGARD that the UCs were in the parking lot.

43.     At approximately 3:18 p.m., surveillance observed HAGGARD, driving PEPPER's Vehicle, pull into the Walgreens parking lot and park next to the UCs' vehicle. At this time, UC-3 exited the front driver's seat of the undercover vehicle and entered the front passenger seat of PEPPER's Vehicle.

44. Based on information from UC-3 and my review of UC-3's audio/video recording device, while inside the vehicle, HAGGARD asked UC-3, "How many you want in total?" UC-3 replied, "I wanted 200, but if you can't do 200, I'll take." HAGGARD replied, "I can do 200. That's what I'm saying I just don't have the whole thing, I don't never bring the whole. I can't bring the whole thing." UC-3 observed HAGGARD take a black plastic bag out of his left pocket. HAGGARD opened the plastic bag and removed an unknown number of small Ziploc-style baggies with blue stars, containing a white powdery substance. HAGGARD counted aloud eight small Ziploc-style baggies with blue stars, containing a white powdery substance and handed them to UC-3. In exchange, UC-3 gave HAGGARD $100. HAGGARD stated that he had to go and get the remaining baggies. HAGGARD reached into his left shoe, removed money, and began counting it. At this time, HAGGARD placed a phone call to an unknown female with UC-3 in the vehicle and stated, "I dialed the wrong fucking number, man. I hate that bitch, Where's Ken [PEPPER] number." While trying to dial a number, HAGGARD received an incoming call and answered it. HAGGARD informed UC-3 that he had to go around the corner to pick up the remaining baggies and gave UC-3 his house keys as a promise that he was coming back with the remaining bags. UC-3 exited PEPPER's Vehicle and returned to the undercover vehicle. HAGGARD departed the Walgreens parking lot northbound on Western Avenue and surveillance was maintained.

45. Several minutes later, surveillance observed HAGGARD pull into the rear alley of PEPPER's Apartment Building. HAGGARD exited PEPPER's Vehicle

16

and entered the rear, fenced area of PEPPER's Apartment Building. A short time later, HAGGARD returned to PEPPER's Vehicle and departed the area.

46.    At approximately 3:33 p.m., surveillance observed PEPPER's Vehicle return to the lot and park next to the undercover vehicle. UC-3 and UC-4 exited the undercover vehicle and walked to PEPPER's Vehicle. UC-3 entered into the front passenger seat of PEPPER's Vehicle, while UC-4 got into the rear passenger side of the vehicle.

47.    Based on information from UC-3 and my review of UC-3's audio/video recording device, UC-3 told HAGGARD that she wanted him to meet her friend (UC-4) and that UC-4 would want to purchase narcotics from HAGGARD in the future. UC-3 passed HAGGARD $100 and HAGGARD counted the money and then counted aloud twelve small Ziploc-style baggies with blue stars, containing a white powdery substance and handed them to UC-3. HAGGARD stated, "I can only bring so many at a time. It's too fucking hot out here." UC-3 then asked HAGGARD what other narcotics he could get, at which time, HAGGARD showed UC-3 and UC-4 that he had multiple small Ziploc-style baggies with blue stars, containing a white powdery substance and smaller blue baggies containing a white rock-like substance, suspect crack cocaine. HAGGARD stated, "Only thing we really getting now is just this fucking um we get these God damnit rocks [crack cocaine] and fucking dope [heroin/fentanyl] right now. I got one dude that fuck with the X [ecstasy] that I know of." UC-3 and UC-4 then exited PEPPER's Vehicle, returned to the undercover vehicle, and departed.

17

48.     Law enforcement submitted the baggies containing the approximately 36.6 grams (gross weight) of suspect heroin mixed with fentanyl that HAGGARD distributed to the UCs to the DEA Laboratory for analysis. Laboratory results are pending.

**D.**     ***May 8, 2020: HAGGARD Distributed Approximately 17.2 grams (Gross Weight) of Suspect Fentanyl Laced Heroin to UC-4 Supplied by PEPPER From PEPPER's Apartment Building.***

49.     On May 7, 2020, at approximately 10:09 p.m., UC-4 placed a consensually-recorded call to HAGGARD, who was using HAGGARD's Phone. UC-4 asked HAGGARD, "Can I come down early tomorrow and get uh I'm gonna put 200 [$200 worth of heroin] together." HAGGARD replied, "Okay just call me."

50.     On May 8, 2020, at approximately 12:10 p.m., UC-4 placed a consensually-recorded call to HAGGARD, who was using HAGGARD's Phone. During this call, UC-4 asked, "Can you still hook me up with those uh 20 [20 baggies of heroin]?" HAGGARD replied, "Yeah." HAGGARD and UC-4 agreed to meet at the Walgreen's located at 2340 W. Madison Street. UC-4 informed HAGGARD that she would be about another thirty minutes and HAGGARD advised, "My guy on his way back with the car anyways."

51.     At approximately 12:36 p.m., UC-4 placed a recorded call to HAGGARD. UC-4 stated, "I'm like coming down Western, prolly like 5, 5 away." HAGGARD replied, "He on his way to grab me, man. He gonna meet me right there, same place, as long as you ain't bring no goddamn police." UC-4 replied, "No, no fucking police, no, no, fuck that shit." HAGGARD replied, "Okay I don't play those fucking games,

18

man." HAGGARD explained that he had gotten "jammed" up before; UC-4 and HAGGARD continued to discuss that they did not want the police involved and that they do not play games.

52.     At approximately 12:40 p.m., UC-4 activated audio/video recording devices, which would later produce audio/video footage of HAGGARD selling UC-4 narcotics. At this time, UC-4 departed the briefing location in an undercover vehicle, followed by surveillance to the meeting location.

53.     At approximately 12:44 p.m., UC-4 arrived and parked in the Walgreens parking lot, located at 2340 W. Madison Street.

54.     At approximately 12:45 p.m., surveillance observed a silver Chrysler sedan (the "Chrysler sedan"), bearing Illinois registration Z248934,[6] pull into the Walgreens lot and park along Western Avenue.

55.     At approximately 12:48 p.m., UC-4 placed a recorded call to HAGGARD. During this call, UC-4 advised that he/she was parked in the lot. HAGGARD advised, "I'm right here in a little grey car." UC-4 asked, "You want me to jump out?" HAGGARD replied, "Yeah, yeah come on yeah, yeah."

56.     At approximately 12:49 p.m., UC-4 exited the undercover vehicle and approached the Chrysler sedan. UC-4 observed HAGGARD in the front passenger seat, wearing a dark colored jacket, blue jeans, and a black knit hat, and an unknown

---

[6] According to Illinois Secretary of State Records, the 2015 Silver Chrysler Sedan, VIN# 1C3CCCAB5FN683058, bearing Illinois registration Z248934 is registered to Individual A at 1340 S. Troy Street, Chicago, Illinois. Based on prior surveillance observations, this vehicle has been used by HAGGARD to conduct narcotics transactions since on or about May 4, 2020, the date in which PEPPER's Vehicle was involved in a car accident.

male, wearing dark clothing and glasses, in the driver's seat. UC-4 entered the rear driver's side of the Chrysler sedan. Based on my review of the audio/video recording, UC-4, HAGGARD, and the unidentified male greeted. While inside the vehicle HAGGARD stated, "You know what I had to do last time right?" UC-4 asked, "Can I stay here? You gonna go and get it?" HAGGARD replied, "I don't want you to leave, when I go get this shit [narcotics]. Man, cause, I got this dude waiting." UC-4 explained that he/she was not going to leave. HAGGARD stated, "This is eight, like we did last time. This is eight bags [of heroin]." HAGGARD then counted aloud eight baggies, clear with blue stars containing a white powdery substance, suspect heroin/fentanyl, and passed the eight baggies to UC-4. HAGGARD stated, "I'mma leave you something because I need the $20 to close the count." UC-4 then passed HAGGARD $100. HAGGARD passed UC-4 his keys. HAGGARD asked, "This is 100 [$100] right? I'mma call this motherfucker right now so he's downstairs waiting for me. HAGGARD then placed a call and stated, "You got snoff [soft]." HAGGARD ended the call and UC-4 exited the vehicle and returned to the undercover vehicle. HAGGARD and the unidentified drove from the parking lot.

57.     At approximately 12:53 p.m., surveillance observed the Chrysler sedan pull into the rear parking area of PEPPER's Apartment Building. HAGGARD exited the Chrysler sedan and walked into the rear-fenced area of PEPPER's Apartment Building and out of view of surveillance

58.    At approximately 12:55 p.m., surveillance observed HAGGARD exit the rear-fenced area of PEPPER's Apartment Building, enter the driver's side of the Chrysler sedan, and pull away from PEPPER's Apartment Building.

59.    At approximately 12:57 p.m., UC-4 observed the Chrysler sedan pull into the parking lot and park east of the undercover vehicle.

60.    At approximately 12:59 p.m., UC-4 observed HAGGARD exit the passenger side of the Chrysler sedan and walk towards the undercover vehicle. HAGGARD entered the front passenger seat of the undercover vehicle. Based on my review of the audio/video recording, when HAGGARD entered the vehicle, he and UC-4 discussed the current police presence in the parking lot. UC-4 then passed HAGGARD $100. HAGGARD counted the money aloud. HAGGARD asked, "So I owe you what?" UC-4 stated, "12 [baggies of heroin] you gave me eight last time." HAGGARD then reached into the back of his pants and removed a white paper towel which contained an unknown number of clear baggies, with blue stars, containing a white powdery substance, suspect heroin/fentanyl. HAGGARD counted aloud 10 baggies and passed them to UC-4. HAGGARD then passed two more bags containing a white powdery substance (suspect heroin/fentanyl) to UC-4. HAGGARD stated, "There are 14 [baggies of heroin] in these things." UC-4 observed HAGGARD wrap two baggies back inside the white paper towel, and placed them back inside his pants. UC-4 asked HAGGARD if he had a connection to get ecstasy. HAGGARD replied, "Yeah, I'mma call you though." HAGGARD then exited the undercover vehicle.

61.     Law enforcement submitted the twenty baggies containing 17.2 grams (gross weight) of suspect heroin mixed with fentanyl that HAGGARD distributed to the UC's to the DEA Laboratory for analysis. Laboratory results are pending.

### E.     May 15, 2020: HAGGARD received a supply of narcotics From Individual TS at PEPPER's direction.

62.     On or about May 15, 2020, at approximately 10:18 a.m., HAGGARD, using HAGGARD's Phone, placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 6500). During this call, HAGGARD asked, "Hey Sin-oft, sin-oft [heroin/fentanyl]?" PEPPER replied, "Yeah."

63.     At approximately 10:18 a.m., PEPPER, using Target Phone 3 (Target Phone 3, Session 6502), placed a call to Individual TS, who was using Individual TS's Phone. During this call, PEPPER stated, "Finna come down there. You'll give him [HAGGARD], give him [HAGGARD] one of them, um...soft thing [heroin/fentanyl]." Individual TS replied, "Okay." PEPPER continued, "He gon' give you a deuce [$200]." Individual TS replied, "Okay."

64.     Several minutes later, surveillance observed a silver Chrysler sedan pull near the rear fenced area of PEPPER's Apartment Building.

65.     At approximately 10:25 a.m., HAGGARD, using HAGGARD's Phone, placed a call to PEPPER, who was using Target Phone 3 (Target Phone 3, Session 6504). HAGGARD said, "Yeah, I'm down here, man." PEPPER replied, "Alright."

66.     At approximately 10:26 p.m., surveillance observed HAGGARD exit the passenger side of the Chrysler sedan and enter the rear, fenced area of PEPPER's Apartment Building. Approximately three minutes later, surveillance observed

HAGGARD exit the rear fenced area and enter the passenger side of the Chrysler sedan. The vehicle then departed the area.

### F.    June 22, 2020: HAGGARD Received a supply of narcotics from PEPPER.

67.    Based on my training and experience, and the intercepted calls below, I believe that on or about June 22, 2020, HAGGARD went to PEPPER's Apartment Building to receive a supply of narcotics from PEPPER to distribute to customers on PEPPER's behalf.

68.    On or about June 22, 2020, at approximately 11:05 a.m., PEPPER, using Target Phone 3 (Target Phone 3, Session 9059), had a conversation with HAGGARD, who was using HAGGARD's Phone. During this call, HAGGARD stated, "Yeah, Joe. I'm out [of narcotics]. I need some [narcotics]." PEPPER replied, "Come to the back [of PEPPER's Apartment Building]." HAGGARD replied, "Yeah, I [unintelligible]. I'm gonna start my way out there."

69.    At approximately 11:25 a.m., surveillance, via surveillance footage, observed a grey Buick sedan pull into the rear alley behind PEPPER's Apartment Building. HAGGARD exited the passenger side of the vehicle and walked into the rear, fenced area of PEPPER's Apartment Building.

70.    At approximately the same time, HAGGARD, using HAGGARD's Phone, placed a call to PEPPER at Target Phone 3 (Target Phone 3, Session 9062). During the call, HAGGARD stated, "I'm downstairs." PEPPER replied, "All right."

71.    At approximately 11:40 a.m., surveillance, via surveillance footage, observed HAGGARD exit the rear, fenced area of PEPPER's Apartment Building and

approach the Buick sedan. Moments later, HAGGARD again walked into the rear fenced area of PEPPER's Apartment Building.

72. At approximately 11:48 a.m., PEPPER, using Target Phone 3 (Target Phone 3, Session 9078), had a conversation with HAGGARD, who was using HAGGARD's Phone. During this call, PEPPER asked, "You just called me?" HAGGARD replied, "Yeah, I'm waiting on you." PEPPER replied, "Oh, you downstairs?" HAGGARD replied, "Yeah, I've been down here. I told you last time." PEPPER replied, "My bad."

73. At approximately 11:52 a.m., law enforcement, via surveillance footage, observed HAGGARD exit the rear fenced area of PEPPER's Apartment Building, reenter the Buick and pull away.

## Conclusion

74.     Based on the foregoing, there is probable cause to believe that, from on or about April 22, 2020, to on or about June 22, 2020, PEPPER and HAGGARD conspired to knowingly and intentionally distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, and   a quantity of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

FURTHER AFFIANT SAYETH NOT.

ARTYOM POSTUPAKA
Special     Agent,     Drug     Enforcement
Administration


SUBSCRIBED AND SWORN to telephonically before me on June 26, 2020.

Honorable Maria Valdez
United States Magistrate Judge

25